# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA
# FRESNO DIVISION

| | |
|---|---|
| **MANUEL MIGUEL MARTINEZ**, <br><br> Petitioner, <br><br> vs. <br><br> **TIPTON, DIRECTOR** <br><br> Respondent. | CASE NO. 08cv0360-BTM(PCL) <br><br> **ORDER DENYING 28 U.S.C. § 2254 PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY** |

Petitioner Manuel Miguel Martinez ("Martinez"), a state prisoner proceeding *pro se* and *in forma pauperis*, seeks a 28 U.S.C. § 2254 writ of habeas corpus. He is serving a sentence of life in prison without the possibility of parole following his conviction by a jury in December 2005 of first degree murder, and a consecutive term of 25-years-to-life for personally and intentionally discharging a firearm causing death in that incident. His sentence reflects enhancements for additional true findings of special circumstance street gang allegations. Martinez alleges two grounds for federal habeas relief, one challenging the constitutionality of a provision in California's street gang statute for facial vagueness, and one challenging the admission of certain evidence as a violation of his due process rights or, alternatively, as ineffective assistance of counsel. Respondent filed an Answer

addressing the merits of the Petition, but also contending Martinez failed to exhaust his second ground. (Dkt. No. 9.) Martinez filed a Traverse. (Dkt. No.12.) By Order entered November 25, 2008, this matter was reassigned from the bench of the United States District Court for the Eastern District of California, Fresno Division, to visiting District Judge Barry T. Moskowitz, United States District Court for the Southern District of California. (Dkt No. 34.) After consideration of the parties' arguments, pertinent portions of the record, and controlling legal authority, for the reasons discussed below, the Petition is **DENIED**.

I.     BACKGROUND

    A.     **Procedural Background**

On December 2, 2005, a jury convicted Martinez of first degree murder (CAL. PENAL CODE § 187) and found true the special circumstances: he was an active criminal street gang participant and the murder was committed to further the activities of the gang (CAL. PENAL CODE §190.2(a)(22)); he personally and intentionally discharged a firearm causing great bodily injury and death (CAL. PENAL CODE § 12022.53(d)); he personally used a firearm (CAL. PENAL CODE §§ 12022.5(a)); and he committed the offense for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by the gang members within the meaning of CAL. PENAL CODE § 186.22(b). (Clerk's Transcript ("CT") Vol. II, pp. 484-485, 487-491.) On January 18, 2006, he was sentenced to state prison for life without possibility of parole for the special-circumstance murder, plus 25 years to life for intentionally discharging a firearm causing great bodily injury and death, with the other enhancements stayed, and was ordered to pay a $10,000 restitution fine (CAL. PENAL CODE § 1202.4) and $10,000 parole revocation fine (CAL. PENAL CODE § 1202.45). (CT Vol. II, pp. 518-520.)

Martinez appealed, contending the street gang special circumstance statute is unconstitutionally vague, the trial court erred in admitting certain evidence, and the parole revocation fine portion of his sentence is not authorized by law. (Lodg. No. 1.) The California Court of Appeal modified the judgment on January 3, 2007 in its unpublished opinion to strike the $10,000 parole revocation fine as inapplicable when there is no parole eligibility, but affirmed in all other respects. (Lodg. 4, pp. 2, 9.) On March 14, 2007, the California Supreme Court denied his Petition for Review, without

discussion or citation to authority. (Lodg. No. 6.) On March 13, 2008, Martinez timely filed this federal Petition for Writ of Habeas Corpus ("Petition"). He alleges: (1) the statutory street gang special circumstance "active participation" provision is unconstitutionally vague, requiring the associated enhancement to his sentence be stricken; and (2) the admission at trial of evidence he possessed a firearm not used in the charged crimes violated his due process rights or, alternatively, his trial counsel was ineffective for failing to object to that evidence on relevance and prejudice grounds in addition to the hearsay objection counsel raised.

### B. Factual Background

Federal habeas courts presume the correctness of a state court's determination of factual issues, and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The parties do not dispute here the Court of Appeal's factual summary affirming Martinez's conviction and sentence, although Martinez's defense theory was that he was not present at the murder.[1] He does not challenge the sufficiency of the evidence presented.

> Pablo Garcia, a Sureño gang member and associate of Martinez, testified for the prosecution pursuant to an agreement whereby he was allowed to plead to voluntary manslaughter and would receive a 12-year sentence if he testified truthfully.[2] According to Garcia, at approximately 8:00 p.m. on April 8, 200[3], he and fellow Sureño gang members, Jose Lemus, Rolando Bermudes, Juan Luna and David Lopez were drinking at Bermudes's house in Porterville when they decided to go to the J Street Bridge to pick a fight with Norteño gang members. After Martinez walked by the bridge and Bermudes returned with him to Bermudes's house, three Norteño gang members showed up at the bridge. Garcia walked up to the rival gang members to confront them expecting his fellow gang members to back him up. However, when he looked back he saw his friends running away. Garcia attempted to flee but tripped and was stabbed twice by a rival gang member before he was able to get up and run back to Bermudes's house.
>
> Garcia told his fellow gang members, including Martinez, what happened. Afterwards, Garcia, Bermudes, Lemus, and Martinez went to Martinez's house to get Martinez's sawed-off shotgun. In route, they talked about getting back at the Norteño gang members who attacked Garcia. Martinez got the shotgun from his house and

---

[1] Martinez did not testify at his trial, but a tape recording of his police interview conducted about three months after the murder was entered into evidence, and on that recording, consistent with his defense theory at trial, he said he lent his shotgun, the murder weapon, to a friend who must have been the murderer. (Reporter's Transcript ("RT") Vol. 4, pp. 688-689.)

[2] Garcia's testimony appears at RT Vol. 3, pp. 398-481, 484-501, 504-531. In a First Amended Complaint, Garcia was an additional named defendant, as was another participant, Jose Lemus. (CT II p. 318.) Martinez was ultimately tried alone.

concealed it under a trench coat he was wearing. The four men then went to an apartment complex where Norteño gang members hung out. However, after not seeing any rival gang members, the group decided to go buy beer.

On the way, they saw Francisco Martinez (Francisco), a Norteño gang member, on Orange Street walking on the sidewalk wearing a burgundy shirt.[3] As Martinez and his group passed by, Francisco "mad-dogged" them and threw up his hands as if to challenge them. The car then stopped and Garcia, Bermudes, and Martinez, with the shotgun under his trench coat, began walking toward Francisco. As they approached, Bermudes asked Francisco where he was from and Francisco replied, "VCP norte." Garcia then began punching Francisco, knocking him to the ground, and Bermude[s] kicked him in the face. As Garcia walked back to the car he heard Bermudes say, "Blast him" and he saw Martinez shoot Francisco with the shotgun three times at close range. The men then ran back to the car and were driven away by Lemus. Fn.2.

> Fn. 2. After Police arrived a short time later, the victim was taken to a hospital where he was pronounced dead.

Luna testified that on April 8, 2003, after Garcia returned to Bermudes's house after being stabbed, Martinez got mad and asked for ride to his house to get his shotgun. Luna stayed at Bermudes's house while Martinez, Lemus, Bermudes, and Garcia left. Martinez and the others returned in about 20 minutes. Prior to their return Luna heard three shotgun blasts. When Martinez and the others returned Martinez had the shotgun and was laughing as he pretended to reload it.[4]

Arcelia Alcantar testified that on the night of April 8, she was at a trailer in the backyard of Bermudes's house when Martinez entered the trailer carrying a black firearm with a short barrel and left immediately upon seeing her there.[5]

Maria Cruz testified that on the night of April 13, 2003, someone shot at the house next door to her house on Vandella Street in Porterville.

Martinez was interviewed by police on July 9, 2003. In his taped interview with police, which was submitted into evidence, Martinez stated that he was at Cruz's house on Vandella when the house next door was shot at. Prior to the shooting, he saw a young male walking in front of the house. Suddenly, he heard shots coming from a car and he shot back with his shotgun four or five times. Martinez described the shotgun as a black, .12-gauge, sawed-off shotgun with a pistol handle. According to Martinez, the shotgun had been at the Vandella house for a few days because Bermudes took it there. Martinez further stated that on the day of the murder Bermudes went to his house with Garcia and two other men and borrowed the shotgun because they had "problems with some people." Martinez admitted that his shotgun had been used to murder Francisco but denied any involvement in the murder. Fn.3. According to Martinez, Bermudes must have shot Francisco because he borrowed the shotgun from Martinez.

\\

---

[3] The significance was linked at trial to rival gang colors: Surenos claim blue; Nortenos claim red.

[4] Luna's testimony appears at RT Vol. 3, pp. 295-280, 390-395.

[5] Alcantar's testimony appears at RT Vol. 2, pp. 188-207, Vol. 3, pp. 212-221, 226-237.

> Fn.3. The prosecution also presented evidence that a police officer recovered a casing from the front yard of the Vandella house the morning after the shooting there and that that casing and casings recovered from the murder scene had been fired from the same shotgun, i.e., Martinez's shotgun.
>
> Crystal Foster testified that she lived at the Vandella address at the time of the drive-by shooting next door. Sometime in April 2003, she was with Martinez and noticed that he appeared upset. When she asked him what was bothering him, Martinez said that he had shot someone named Frankie (Francisco) Martinez at a pay phone on Orange Street. [6] Foster told Martinez that she did not believe him and Martinez replied that he did. When she said that she thought he was just taking the blame for someone else, Martinez said he was not and that it was a gang thing. Martinez also told Foster that Norteño gang members shot at her house because they knew that Martinez had shot Frankie and that he was there at the house.
>
> Foster also testified, without objection, that she had previously seen Martinez with a shotgun and with a rifle. The shotgun and rifle each had a symbol indicting that they were sheriff-issued. Martinez carried the shotgun for protection.
>
> Martinez did not testify. However, the defense presented two witnesses who testified that the people who assaulted the victim appeared to be teenagers. Fn.4
>
> Fn.4. Martinez was 26 years old at the time of the murder.

(Lodg. 4, pp. 2-5.)

In addition to the witnesses who testified as summarized above, the prosecutor also called Martinez's mother, Rosie Martinez. (RT Vol. 3, pp. 265-282, 287-295.) She testified Martinez was living with her in 2003. She testified he did not have a black trench coat. (RT Vol. 3, p. 278.) She testified he was at the house all day and evening on April 8, 2003, his daughter's birthday, and was still there the next morning. (RT Vol. 3, pp. 282, 287-289.) She stated she had never seen him with a gun or with pieces of a gun. (RT Vol. 3, p. 268.) She confirmed police detective John Olmos and another officer had come to her house in June 2003, and she allowed them to look in Martinez's room. She denied she told the officers at that time she had seen Martinez with a small pistol with missing parts in March 2003 and denied seeing such a gun. (RT Vol. 3, pp. 272-273.)

The prosecutor then called investigating detective John Olmos. He testified, as pertinent here, he had interviewed Rosie Martinez in June 2003 at her house. He contradicted the portion of her trial

---

[6] Foster's direct examination testimony appears at RT Vol. 2, pp. 122-148. Testimony at trial from a police officer responding to the crime established Francisco's body was located on the street "three to five feet" from a phone booth attached to the wall of a business. (RT Vol. 2, p. 92.)

1  testimony summarized above.  Defense counsel objected on hearsay grounds, but the court permitted
2  Detective Olmos to testify about what she had told him when the prosecutor represented he was "trying
3  to lay the foundation for an inconsistent statement."  Detective Olmos recounted Mrs. Martinez told
4  him Martinez only came home once every three weeks or so just to sleep and had basically vacated his
5  room.  (RT Vol. 4, pp. 545-546.)  Again over counsel's hearsay objection, the court permitted
6  Detective Olmos to repeat her statements to him about having seen Martinez in March 2003 with a
7  small pistol which was missing parts and his telling her he was going to put a gun together for his
8  father.  (RT Vol. 4, pp. 549-551.)  Defense counsel sought to recall Rosie Martinez to rebut the
9  officer's testimony impeaching her with her prior representations inconsistent with her trial testimony,
10 but the trial court found it would be improper rebuttal.  (RT Vol. 4, pp. 690-691.)

11        The only testifying defense witnesses were two women who were driving by, saw the fight
12 between three men and Francisco, heard shots, and called police.  They testified they did not get a good
13 look at any of the men and could not identify them other than by describing their clothes and
14 estimating their approximate ages to be late teens.  (RT Vol. 4, pp. 692-723.)  The jury deliberated
15 about six or seven hours following the seven-day trial before convicting Martinez as charged,
16 including true findings on all enhancement allegations.  (CT Vol. II, pp. 484-491.)

17 **II.    DISCUSSION**
18       **A.    Legal Standards**
19       A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person
20 in custody pursuant to the judgment of a State court only on the ground he is in custody in violation
21 of the Constitution or laws or treaties of the United States."  28 U.S.C.A. § 2254(a) (2006).  Only
22 errors of federal law can support federal intervention in state court proceedings.  Oxborrow v.
23 Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989).  Relief is contingent on a determination
24 constitutional error occurred and that the error "had [a] substantial and injurious effect or influence
25 in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citation and
26 internal quotation omitted).  Federal habeas courts are bound by a states' interpretation of its own laws.
27 Estelle v. McGuire, 502 U.S. 62, 68 (1991); Himes v. Thompson, 336 F.3d 848, 852 (9th Cir. 2003).
28 \\

Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S. C. § 2244(d)(1). AEDPA establishes a "highly deferential standard for evaluating state-court rulings," requiring "that state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002). Federal habeas relief is available only if the result of a claim the state court adjudicated on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see* Bell v. Cone, 535 U.S. 685, 694 (2002). Federal courts must presume the correctness of a state court's factual determinations unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (a state court's merits adjudication "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding").

" '[C]learly established Federal law . . . refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.' " Carey v. Musladin, 549 U.S. 70, 74 (2006), *quoting* Williams v. Taylor, 529 U.S. 362, 412 (2000); *see also* Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). For 28 U.S.C. § 2254(d)(1) "contrary to" or "unreasonable application" analysis, clearly established federal law includes "the governing legal principle or principles set forth by the Supreme Court." Andrade, 538 U.S. at 64-65, 76; *see also* Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002) (relevant Supreme Court precedents "include not only bright-line rules but also the legal principles and standards flowing from such precedent") (citations omitted). A state court's decision is "contrary to" clearly established federal law if it (1) applies a rule that contradicts governing Supreme Court authority, or (2) it "confronts a set of facts that are materially indistinguishable from" a Supreme Court decision but reaches a different result. Early v. Packer, 537 U.S. 3, 8 (2002), *quoting* Williams, 529 U.S. at 405-06; *see* Lambert v. Blodgett, 393 F.3d 943. 974 (9th Cir. 2004) (same); Bell, 535 U.S. at 694 (distinguishing the "contrary to" and the "unreasonable application" clauses). To be found "unreasonable," the application "must have been more than incorrect or erroneous;" it "must

\\

1  have been 'objectively unreasonable.' "  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citation
2  omitted); *see also* Middleton v. McNeil, 541 U.S. 433, 436 (2004) (*per curiam*).

3      A federal habeas court applying those standards looks to the last reasoned state court decision.
4  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  "[L]ater unexplained orders upholding
5  the judgment or rejecting the same claim" are deemed to "rest upon the same ground." Ylst v.
6  Nunnemaker, 501 U.S. 797, 803 (1991) (when there is no reasoned decision from the state's highest
7  court, the federal court "looks through" to the rationale of the underlying decision).  A denial by the
8  state's highest court "without comment or citation constitute[s] a decision on the merits of the federal
9  claims," and "thus such claims [are] subject to review in federal habeas proceedings."  Hunter v.
10 Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992).

11     **B.**    **Exhaustion Of State Remedies Rule Does Not Bar Consideration Of This Petition**

12     "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state
13 remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct'
14 alleged violations of prisoners' federal rights.' "  Baldwin v. Reese, 541 U.S. 27, 29 (2004), *quoting*
15 Duncan v. Henry, 513 U.S. 364, 365 (1995) (*per curiam*) (internal citation omitted).  "The state courts
16 have been given a sufficient opportunity to hear an issue when the petitioner has presented the state
17 court with the issue's *factual* and *legal* basis."  Weaver v. Thompson, 197 F.3d 359, 364 (9th Cir.
18 1999) (emphasis added); *see* Duncan, 513 U.S. at 365 (legal basis); Correll v. Stewart, 137 F.3d 1404,
19 1411-12 (9th Cir. 1998) (factual basis).

20     Respondent argues Martinez did not raise as a federal claim in his Petition For Review in the
21 California Supreme Court his Ground Two argument that admitting the hearsay evidence he was seen
22 in possession of a dismantled firearm not used in the crime violated his federal due process rights, and
23 that claim is therefore unexhausted.  (Answer 11:2-3.)  Respondent characterizes his contention in the
24 state courts as limited to allegations "the state court committed error in admitting evidence during
25 trial," a state law claim not cognizable on federal habeas review, citing Windham v. Merkle, 163 F.3d
26 1092, 1103 (9th Cir. 1998) ("We have no authority to review alleged violations of a state's evidentiary
27 rules in a federal habeas proceeding") (citation omitted).  (Answer 11:27-12:1.)
28 \\

"A petitioner has satisfied the exhaustion requirement if:  (1) he has 'fairly presented' his federal claim to the highest state court with jurisdiction to consider it, . . . or (2) he demonstrates that no state remedy remains available.' "[7]  Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996) (citations omitted).  To have exhausted via the first avenue, a petitioner must have presented each federal claim as a federal claim to the California Supreme Court on (1) direct review (*e.g.*, in a petition for review) or (2) collateral review (*e.g.*, in a petition for a writ of habeas corpus).  See Reiger v. Christensen, 789 F.2d 1425, 1427 (9th Cir. 1986); *see also* O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1990); Hiivala v. Wood, 195 F.3d 1098, 1106 (9th Cir. 1999) ("To 'fairly present' [a] federal claim to the state courts, [a petitioner must] alert the state courts to the fact that he [is] asserting a claim under the United States Constitution") *citing* Duncan, 513 U.S. at 365-66.  A "mere similarity between a claim of state and federal error is insufficient to establish exhaustion."  Duncan, 513 U.S. at 366.  In addition, "general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial," do not exhaust a claim.  Hiivala, 195 F.3d at 1106, *citing* Gray v. Netherland, 518 U.S. 152, 162-63 (1996) ("[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court"); *see* Johnson, 88 F.3d at 830-31 (the petitioner's general reference in state proceedings to alleged violations of his "right to present a defense and receive a fair trial" did not satisfy the specificity required for exhaustion); *see also* Shumway v. Payne, 223 F.3d 982, 987 (9th Cir. 2000) (petitioner's bare reference to "due process" was insufficient to have stated a federal claim), *citing* Gray, 518 U.S. at 163.

State prisoners can satisfy the "fair presentation" procedural prerequisite in several ways, "for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.' "  Baldwin, 541 U.S. at 32 (holding a state prisoner ordinarily does not "fairly present" a federal claim to a state court

---

[7] A claim is considered exhausted "if it is clear that the claims are now procedurally barred under [state] law." Gray, 518 U.S. at 162; *see also* Valerio v. Crawford, 306 F.3d 742, 770 (9th Cir. 2002) (claim may be considered exhausted if it is obviously procedurally barred), *citing* Phillips v. Woodford, 267 F.3d 966, 974 (9th Cir. 2001) ("the district court correctly concluded that [petitioner's] claims were nonetheless exhausted because 'a return to state court would be futile' ") (citation omitted). As the Court finds Martinez satisfied the "fair presentation" exhaustion avenue, it need not reach the alternative procedural bar analysis.

if that court must read beyond a petition, a brief, or similar papers to find material that will alert it to the presence of such a claim). In his Petition For Review, Martinez elaborated his theory of prejudicial error in the admission of the other firearm evidence by arguing that fact was "of no relevant consequence to determination of the guilt or innocence of the defendant" in the charged crime. (Lodg. 5, pp. 13, 14, *quoting* People v. Henderson, 58 Cal.App.3d 349, 360 (1976) (a case decided solely with reference to state statutory, evidentiary, and decisional law.)  He argues the evidence should have been excluded on that basis.  He also relied on People v. Riser, 47 Cal.2d 566, 577-78 (1956), *overruled on other grounds* by People v. Chapman, 52 Cal.2d 95 (1959), a case similarly devoid of citation to any federal authority associated with an evidentiary challenge to admission of other weapon evidence at a murder trial.  The Riser court found error in the admission of evidence in the form of "weapons, other than the murder weapon, discovered in the defendant's possession at the time of his arrest, several weeks following his commission of the murder," because "[w]hen the prosecution relies . . . on a specific type of weapon [as the murder weapon], it is error to admit evidence that other weapons were found in [defendant's] possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." Id.  However, the Riser court found no prejudice associated with that error because other "clearly admissible" evidence supported the result.  Martinez also relied on People v. Neely, 6 Cal.4th 877, 886 (1993), a capital homicide prosecution applying "the rule stated in Riser," but distinguishing the facts to hold the admission of gun and ammunition evidence was both probative and not prohibited.[8]

        Had Martinez cited no other authority in his Petition For Review, the Court would have found the claim to be unexhausted.  However, he also cited McKinney v. Rees, 993 F.2d 1378 (9th Cir. 1993), decided on federal constitutional grounds, for the same proposition, *i.e.*, inadmissible other acts evidence deprived the defendant of a fair trial.  The Court construes that citation as alerting

\\

\\

---

[8] Martinez also cited People v. Garceau, 6 Cal.4th 140, 176-77 (1993) applying state law in his Petition For Review in support of the same exclusion argument, misciting the case and failing to signal it was subsequently overruled on several grounds.

1  the state courts to a federal constitutional basis for his evidentiary challenge, exhausting the claim for
2  federal habeas review purposes.[9]  Baldwin, 541 U.S. at 32.

### C. The State Gang Enhancement Statute Is Not Unconstitutionally Vague

Martinez argues in Ground One:  "The 'street gang' special circumstance, defining 'active participation' in a criminal street gang as 'more than in name only, passive, inactive or purely technical,' was unconstitutionally vague, failing to give Petitioner adequate notice of the conduct triggering punishment for the special circumstance, and failing to sufficiently narrow the class of death eligible defendants."  (Pet. 9:20-26.)  The challenged provisions appear in the California Street Terrorism Enforcement and Prevention Act of 1988 (the "STEP Act"), codified at CAL. PENAL CODE §§ 190.2(a)(22), 186.22, 186.22(f).  He contends "the 'street gang' special circumstance should . . . be declared void for vagueness, and the jury's special circumstance finding must therefore be reversed on the grounds that Petitioner's Fifth and Fourteenth Amendments to the United States Constitution have been violated . . . ."[10]  (Pet. 13:11-24.)

Martinez was convicted of the CAL. PENAL CODE § 190.2(a)(22) special circumstance:

> (a) The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4[11] to be true:

---

[9] Even if the claim were not construed as exhausted on that basis, the Court finds all Martinez's claims to be without merit, as discussed below.  There is no statutory impediment to denying a mixed Petition on the merits in its entirety.  Cassett v. Stewart, 406 F.3d 614 (9th Cir. 2005).  "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be *granted* unless it appears that the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C.A. § 2254(b)(1)(A) (emphasis added).  "An application for a writ of habeas corpus may be *denied* on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."  28 U.S.C.A. § 2254(b)(2) (emphasis added).  See Cassett, 406 F.3d at 623-24 (finding that section codifies the decision in Granberry v. Greer, 481 U.S. 129, 135 (1987) permitting a federal court to deny an unexhausted petition on the merits when "the applicant does not raise even a colorable federal claim").

[10] Martinez also argues the jury instructions incorporating those definitions and elements are concomitantly "vague" and therefore unconstitutional, in particular, the formulation of CALJIC 8.81.22 (Special Circumstances – Intentional Killing By Active Street Gang Member), tracking the language of CAL. PENAL CODE § 190.2(a)(22). (Pet. 9:13-26; *see* CT II, p. 411.).  His instructional error claim fails along with the statutory challenge.

[11] When the special circumstances of section 190.2 are alleged "and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance" and, "[i]n case of a reasonable doubt as to whether a special circumstance is true,

>. . . (22) The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang.

The STEP Act definition of unlawful participation in criminal street gangs is codified at CAL. PENAL CODE § 186.22. Martinez does not challenge the gang enhancement specific intent provision the jury expressly found true, CAL. PENAL CODE § 186.22(b)(1), *i.e.*, the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." *See* People v. Gardeley, 14 Cal.4th 605, 623-24 (1996) (upholding the STEP Act's "detailed requirements" as comporting "fully" with federal due process). Rather, he challenges subdivisions (a) and (f) of CAL. PENAL CODE § 186.22, which provide, in pertinent part:

>(a) Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years.
>. . .
>
>(f) As used in this chapter, "criminal street gang" means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity.

Martinez correctly recites the "due process concept of fair warning is the underpinning of the vagueness doctrine, which 'bars enfor[]cement of a "statute which either forbids o[r] requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." ' " (Pet. 10:13-18, *quoting, inter alia,* United States v. Lanier, 520 U.S. 259, 265-66 (1997) (the due process concept of fair warning is the underpinning of the vagueness doctrine); *see also* People v. Castenada, 23 Cal.4th 743, 751 (2000).)

---

the defendant is entitled to a finding that is not true." CAL. PENAL CODE § 190.4(a)

> Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement.

Chicago v. Morales, 527 U.S. 41, 56 (1999), *citing* Kolendar v. Lawson, 461 U.S. 352, 357 (1983).

Respondent argues the Castenada case resolved the issue whether the "active participant" in a criminal street gang language gives adequate notice of the conduct required for criminal liability to avoid unconstitutional vagueness. (Answer 9:22-10:5, citing Castenada, 23 Cal.4th 743.) That court decided the question whether to prove a defendant "actively participates" in a gang, "must the prosecution show that the defendant held a leadership position in the gang," or is it "sufficient if the evidence establishes that the defendant's involvement with the gang is more than nominal or passive?" Castenada, 2 Cal.4th at 745 (concluding the latter). Respondent relies on Wright v. New Jersey, 469 U.S. 1146, 1152 (1985), Brennan J. dissenting, for the additional proposition that STEP Act provision does not suffer from the "fatal defect" discussed in Wright (Answer 10:5-8), that is, vagueness "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all."[12] Wright, 469 U.S. at 1153 (citation omitted). Respondent also appears to argue Martinez's lack of notice argument is somehow blunted by his status as a gang member and his role as the shooter in the murder, although it is unclear how that argument informs the facial unconstitutionality analysis.[13]

In its reasoned decision, the Court of Appeal disposed of Martinez's claim in reliance on Castenada, 23 Cal.4th 743, rejecting his contention the phrase "actively participates" is unconstitutionally vague. (Lodg. 4, p. 6: the California Supreme Court has construed the statutory

---

[12] Respondent fails to signal the cited discussion occurred in the dissenting opinion in Wright, 469 U.S. 1146. The opinion itself is a one-sentence dismissal of that appeal on grounds it lacked "a substantial federal question." Id. at 1146. Nevertheless, the constitutional standards recited in the dissent for assessing the constitutionality of legislation are viable for purposes of this analysis.

[13] Respondent argues: "Furthermore, Petitioner's actions do not indicate his lack of notice **because he was a Sureno gang member and was, as the actual shooter the most "active participant" in the crime, which was by all accounts a gang 'hit.'"** (Answer 10:5-7 (emphasis added).) However, those arguments tend to defend the sufficiency of the evidence for conviction. Martinez does not raise a sufficiency of evidence claim. He does not dispute the murder was the result of criminal conduct by a street gang as required under CAL. PENAL CODE § 186.22(b), nor does he contest his affiliation with the Sureno gang.

language "actively participates in any criminal street gang" and has "clearly defined it as "meaning involvement with a criminal street gang that is more than nominal or passive," *quoting* Castenada, 23 Cal.4th at 747.)   The Castenada court also applied the due process principles from Scales v. United States, 367 U.S. 203 (1961) in reaching its result.[14]  Noting that the Scales Court had held "mere association with a group cannot be punished unless there is proof that the defendant knows of and intends to further its illegal aims," the Castenada court discussed the significance for due process purposes of the elements the Legislature incorporated into CAL. PENAL CODE § 186.22(a) in support of its finding the statute is not unconstitutionally vague.  Castenada, 23 Cal.4th at 749, *citing* Assem. Com. on Pub. Safety, Analysis of Assem. Bill No. 2013 (1987-1988 Reg.Sess.,  June 8, 1987, p. 7.

> This explains why the Legislature expressly required in section 186.22(a) that a defendant not only "actively participates" in a criminal street gang (the phrase at issue here), but also that the defendant does so with "knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity," and that the defendant "willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang."  These statutory elements necessary to prove a violation of section 186.22(a) exceed the due process requirement of personal guilt that the United States Supreme Court articulated in Scales, as we explain.
>
> As we mentioned earlier, the high court in Scales, *supra*, 367 U.S. 203, 228, held that the Smith Act satisfied the due process requirement of personal guilt by requiring proof of a defendant's active membership in a subversive organization with knowledge of and an intent to further its goals.  Here, section 186.22(a) limits liability to those who promote, further, or assist a specific felony committed by gang members and who know of the gang's pattern of criminal gang activity. Thus, a person who violates section 186.22(a) has also aided and abetted a separate felony offense committed by gang members . . . .

Castenada, 23 Cal.4th at 749-50 (parallel citations omitted).[15]

---

[14]  The Scales Court had considered and rejected a defendant's due process challenge to the membership clause of the Smith Act, a federal law prohibiting knowing membership in an organization advocating the violent overthrow of the United States government, finding "active membership" is an association with the group beyond  "nominal, passive, inactive, or purely technical."  Scales, 367 U.S. at 220.

[15]  The Castenada court held "a person liable under section 186.22(a) must aid and abet a separate felony offense committed by gang members," since in that way, "as the bill's proponents stressed, section 186.22(a) 'goes beyond the active membership test in Scales,' " and rejected as the fair warning rule the narrow construction of the CAL. PENAL CODE § 186.22(a) phrase "[a]ny person who actively participates in a criminal street gang" as "referring to a person devoting 'all, or a substantial portion of his time and efforts' to the gang' " in People v. Green, 227 Cal.App.3d 692, 700 (1991). Castenada, 23 Cal.4th at 749-50.

> We have pointed out that, giving the words "actively" and "participates" their usual and ordinary meaning, a person "actively participates in any criminal street gang," within the meaning of section 186.22(a), by "involvement with a criminal street gang that is more than nominal or passive." . . . As the United States Supreme Court observed in Scales, *supra*, 367 U.S. 203, 223, "[t]he distinction between 'active' and 'nominal' membership is well understood in common parlance." Moreover, as we have explained, every person incurring criminal liability under section 186.22(a) has aided and abetted a separate felony offense committed by gang members. . . . By linking criminal liability to a defendant's criminal conduct in furtherance of a street gang, section 186.22(a) reaches only those street gang participants whose gang involvement is, by definition, "more than nominal or passive."

Castenada, 23 Cal.4th at 752 (citation and parallel citation omitted).

The Court finds the Court of Appeal's reliance on the Castenada opinion, applying United States Supreme Court standards to the issue of whether CAL. PENAL CODE § 186.22(a) satisfies due process fair warning, was objectively reasonable and not contrary to nor an unreasonable application of controlling federal authority. For the reasons discussed in that opinion and in consideration of federal authority cited therein, the statutory provision survives Martinez's "void for vagueness" challenge. Accordingly, the Court **DENIES** relief on Petition Ground One.

### D. Admission Of Challenged Testimony At Trial Did Not Violate Due Process

Martinez's defense theory was his friend borrowed his shotgun (the acknowledged murder weapon), and he was not present at the murder, therefore the friend must have killed Francisco. He argues in Ground Two his due process rights were violated by the admission of Detective Olmos' hearsay testimony recounting his mother's prior statements to the police about seeing Martinez with a dismantled pistol, contradicting her trial testimony. Martinez argues the subject matter of that inconsistency was irrelevant to the charged crimes, and the evidence was thus prone to impermissible use by the jury to infer he used guns. In finding harmless error, the Court of Appeal summarized:

> On direct examination, Rosie Martinez, Martinez's mother, testified that she had never seen Martinez with a gun. She also denied seeing him with pieces of a handgun. Subsequently, Porterville Police Detective John Olmos testified, over Martinez's hearsay objection, that Martinez's mother told him that in March 2003 she had seen Martinez with a small pistol that was missing some parts.

(Lodg. 4, p. 6.)

\\

1    Martinez unsuccessfully argued to the California Supreme Court and contends here defense
2 counsel's hearsay objection to that portion of Detective Olmos' testimony (RT Vol. 4, 550-551) should
3 have been sustained and the evidence excluded. (Lodg. 5, p. 13; Pet. 14:10-19.)

> There was absolutely no relevance to the evidence that Petitioner was in possession of a dismant[]led pistol. The uncontroverted evidence was that the charged crimes were committed with a shotgun. The evidence thus "had no tendency in reason to prove or disprove any disputed fact that [was] of consequence to the determination of the action." (Citation.) The evidence should therefore have been excluded.
>
> Here, evidence of Petitioner's possession of a dismantled pistol improperly suggested that he may have been attempting to conceal or destroy evidence used in another shooting. The jury would likely infer from such evidence that he was the type of person who would have committed the charged crimes. (McKinney v. Rees, *supra*, 993 F.2d 1378, 1380.) The prosecution's case was [*sic*] relied heavily on accomplice testimony. The error was therefore prejudicial.

(Pet. 14:27-15:13; Lodg. 5, p. 14.)

"The use of 'other acts' evidence as character evidence is not only impermissible under the theory of evidence codified in the California rules of evidence (CAL. EVID. CODE § 1101[]) and the Federal Rules of Evidence (FED. R. EVID. 404(b)), but is contrary to firmly established principles of Anglo-American jurisprudence." McKinney, 993 F.2d at 1380, 1381 ("The rule against using character evidence to show behavior in conformance therewith, or propensity, is one such historically grounded rule of evidence"). The McKinney court found evidence the defendant possessed weapons not used in the charged crime was erroneously admitted, and the error was not harmless, depriving the defendant of a fair trial in violation of his due process rights, applying the analytical approach from Estelle, 502 U.S. 62. First, examine the contested evidence to determine whether it was relevant to an essential element in the prosecution's case. Second, if not relevant, determine whether the admitted evidence rendered the trial fundamentally unfair. Id. at 1380-81.

To prove Martinez guilty of first-degree murder, the prosecution had to convince the jury: (1) he killed a human being; (2) the killing was unlawful; (3) he killed with malice aforethought; and (4) the killing was "willful, deliberate and premeditated," "with express malice aforethought." CAL. PENAL CODE § 187; CALJIC 8.10, 8.20 (CT Vol. II, pp. 403, 405). The step one inquiry determines "whether the admitted evidence of 'other acts' of the defendant was relevant to a fact of consequence,

or was only evidence of character offered to show propensity." McKinney, 993 F.2d at 1381. If the other firearm "evidence tended to make any fact relevant to these elements more or less probable, it was relevant and admissible. . . ." Id. at 1382. In its reasoned opinion, the Court of Appeal found a permissible use of the hearsay evidence from Detective Olmos under state law (*i.e.*, impeachment). However, a federal habeas court is only concerned with the relevance of the challenged evidence, not its admissibility under California law. Id. at 1384. The Court concludes here that the evidence Martinez possessed a dismantled pistol on some prior occasion was not probative of any element of the murder charge and had negligible value as impeachment of the petitioner's mother's credibility as to whether she saw petitioner with a gun. Petitioner admitted that the shotgun was his and he fired it on another occasion.

At step two, even if the "other acts" evidence was inadmissible because "probative only of character and, thus, irrelevant," no federal habeas relief is warranted unless "the erroneously admitted evidence was 'of such quality as necessarily prevents a fair trial.' " McKinney, 993 F.2d at 1384 (citation omitted), *quoting, inter alia,* Lisenba v. California, 314 U.S. 219, 236 (1941). "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Admission of irrelevant character evidence devoid of permissible inferences *can* violated due process. However, federal habeas relief is only warranted if the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. The court must therefore consider the case as a whole to determine whether the use of evidence showing propensity *actually* prejudiced the defendant. McKinney, 993 F.2d at 1384-85.

The Court concludes, based on its review of the record, the result on this issue in the reasoned decision of the Court of Appeal was not contrary to nor an unreasonable application of controlling federal authority, nor did it entail an unreasonable determination of the facts. Even assuming the other weapon evidence was erroneously admitted as character evidence, it is not reasonably probable that evidence injuriously influenced the verdicts.

> Here, Martinez admitted in his taped statement to the police that he owned a sawed-off shotgun and that his shotgun was used to kill the victim. He also admitted that he had the shotgun in his possession on

> the night of the drive-by shooting [about five days after the murder] and that he discharged it four or five times at the vehicle involved in that shooting. Further, Foster testified that she had seen Martinez in possession of a shotgun and a rifle and that Martinez told her he carried the shotgun for protection. Additionally, at least three witnesses saw him in possession of the shotgun on the night of the murder. Thus, the evidence that he was in possession of a dismantled gun did not prejudice Martinez because the evidence was undisputed that he routinely possessed firearms.
>
> Moreover, the evidence that he possessed a dismantled pistol did not result in a miscarriage of justice because the evidence of Martinez's guilt was overwhelming. The prosecution presented physical evidence that Martinez's gun was used to kill the victim and Martinez's admission to that effect. Thus the main issue in the case was whether Martinez or someone else had used Martinez's shotgun for this purpose. Further, Garcia, Martinez's fellow gang member, testified that Martinez shot the victim three times with the shotgun in retaliation for the attack on Garcia by rival gang members. Garcia's testimony was corroborated by Foster who testified that Martinez admitted to her that he killed the victim and by Alcantar and fellow gang member Juan Luna who each testified to seeing Martinez with the shotgun the night of the murder.
>
> In contrast, Martinez did not testify and the defense evidence was limited to the testimony of two witnesses who testified that the people who attacked the victim looked like teenagers.

(Lodg. 4, pp. 7-8.)

The Court finds the Court of Appeal made objectively reasonable findings of fact on this issue. 28 U.S.C. § 2254(d)(2). Any peripheral import of the evidence his mother had seen Martinez with a partially-dismantled pistol at some other time was no more than cumulative of other evidence unequivocally substantiating he routinely possessed weapons. Unlike the irrelevant knife evidence admitted in McKinney, it cannot be said admission of Martinez's mother's prior inconsistent statement to police on that issue so "infused [the trial] with irrelevant prejudicial evidence as to be fundamentally unfair," warranting habeas relief. McKinney, 993 F.2d at 1386. Accordingly, habeas relief under Martinez's Petition Ground Two due process theory is **DENIED**.

      E.     **Defense Counsel Was Not Unconstitutionally Ineffective**

Martinez alternatively argues in Ground Two if his due process challenge to the admission of irrelevant character evidence fails to afford him habeas relief, his counsel was ineffective for objecting to the admission of the dismantled firearm evidence only on hearsay grounds. He contends that lone ground for exclusion could be construed as a waiver of objections on other grounds, in particular due

process, relevance, and CAL. EVID. CODE § 352 (prejudicial effect of the evidence versus its probative value).[16] (Lodg. 5, p. 15; Pet. pp. 15-16.) He then speculates: "Assuming, without conceding, that the failure to additionally object on the due process, relevance and Evidence Code section 352 grounds operated as a waiver on appeal, then petitioner was effectively denied the right to effective assistance of trial counsel by the om[]issions." (Pet. 15:21-25.)

Martinez's speculation presents no cognizable ineffective assistance of counsel ("IAC") claim because the Court of Appeal did not decline to consider those additional arguments. The Court of Appeal reached the merits of his alleged erroneous admission of evidence claim by "assuming without deciding, that Martinez's hearsay objection properly preserved this issue on appeal," then "reject[ing] Martinez's contention that the prejudicial effect of this evidence outweighed its probative value." (Lodg. 4, pp. 6-8.) That result was not contrary to nor an unreasonable application of controlling United States Supreme Court authority. Martinez cites no United States Supreme Court authority for his IAC claim in his federal Petition, and he cited only one California Supreme Court case as legal authority for his IAC claim in his Petition For Review, People v. Pope, 23 Cal.3d 412, 423 (1979). (Lodg. 5, p. 16.) The Pope case predates the controlling federal standard for adjudicating IAC claims clearly established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), a case decided two decades before his trial. Respondent argues the Court of Appeal reasonably found no IAC occurred, and the result is not contrary to Strickland.

> In Strickland, . . . we announced a two-part test for evaluating claims that a defendant's counsel performed so incompetently in his or her representation of a defendant that the defendant's sentence or conviction should be reversed. We reasoned that there would be a sufficient indication that counsel's assistance was defective enough to undermine confidence in a proceeding's result if the defendant proved two things: first, that counsel's "representation fell below an objective standard of reasonableness," . . .; and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[]."

Bell, 535 U.S. at 695, *quoting* Strickland, 466 U.S. at 688, 694 (a sentence or conviction should stand

---

[16] Martinez simultaneously argues, inconsistently with his theory counsel was so incompetent in that regard as to have deprived him of a fair trial, the "trial court's ruling [overruling counsel's hearsay objection] thus rendered any further objection to the admis[s]ibility of the evidence futile." (Pet. 15:19-20.)

1  without proof of both deficient performance and prejudice to the defense because it cannot otherwise
2  be said the sentence or conviction "resulted from a breakdown in the adversary process that rendered
3  the result of the proceeding unreliable") (citation omitted).

4        As traced above, the Court of Appeal reasonably found on the merits the admission of the other
5  weapon evidence did not prejudice the outcome of Martinez's trial.  (Lodg. 4, p. 7.)  If admission of
6  the evidence was not prejudicial, then necessarily counsel's failure to prevent its admission could not
7  be found prejudicial.  "Failure to satisfy either prong of the Strickland test obviates the need to
8  consider the other," since both must be demonstrated to warrant relief on an IAC theory.  Rios v.
9  Rocha, 299 F.3d 796, 805 (9th Cir. 2002).  Any error by counsel was thus harmless because lack of
10 objection on those additional grounds did not in fact preclude appellate review on those exclusionary
11 theories.  For the reasons discussed above on the merits of the evidentiary challenge, the Court finds
12 Martinez cannot satisfy the prejudice prong of the IAC showing required to prevail on that theory
13 because it is not reasonably probable the outcome would have been different but for counsel's failure
14 to object to admission of that evidence on any additional grounds, even if counsel had convinced the
15 trial court to exclude that evidence.  Strickland, 466 U.S. at 668.  Habeas relief on this alternative
16 Ground Two theory is accordingly **DENIED**.

17 **III.    CONCLUSION AND ORDER**

18       For all the foregoing reasons, **IT IS HEREBY ORDERED** Martinez's Petition is **DENIED**
19 in its entirety.  The Court **GRANTS** petitioner a Certificate of Appealability as to all claims.  The
20 Clerk shall enter judgments denying the Petition and granting a Certificate of Appealability as to all
21 claims.

22     **IT IS SO ORDERED**.
23 Dated: December 3, 2009

                                            _____
24                                             Honorable Barry T. Moskowitz
                                            United States District Judge